IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNIVERSITY OF MASSACHUSETTS,<br><br>Plaintiff,<br><br>v.<br><br>JAMES M. ROBL and PHILIPPE COLLAS,<br><br>Defendants. | CIVIL ACTION NO. 04-11013-RGS |

## DEFENDANTS JAMES M. ROBL AND PHILIPPE COLLAS' OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

Defendants James M. Robl ("Robl") and Philippe Collas ("Collas") (the "Defendants") submit this Opposition to Plaintiff University of Massachusetts' (the "University" or the "Plaintiff") Motion to Remand this matter to the Suffolk County Superior Court. This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a), 1338(a) and 1367(a), and therefore this Court should deny Plaintiff's Motion to Remand.

### BACKGROUND

This action arises out of a dispute concerning inventions in the field of animal cloning and cell reprogramming. The Plaintiff is seeking expectation damages resulting from its alleged inability to file, support, prosecute and obtain the issuance of patents that fully describe and disclose certain inventions. The Plaintiff further claims that at least some of the disputed inventions are the same as those contained in Patent Applications filed by the Defendants at the United States Patent and Trademark Office (the "USPTO"). Ascertaining the scope and content of these inventions unavoidably implicates federal

patent law. While the Plaintiff has also asserted a litany of common law contractual claims, this case will ultimately turn on the construction of claims in the Defendants' Patent Applications, and a comparison of those claims with the Plaintiff's claimed inventions.

As a consequence, this Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1338(a) and 1367(a), pursuant to which the federal district courts have original and exclusive jurisdiction over any civil action arising under any act of Congress relating to patents, and supplemental jurisdiction over certain related claims. The Court also has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), in that the matter in controversy, as set forth in the Complaint, exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

## ARGUMENT

I. This Court has Federal Question Jurisdiction Over this Action Because Resolution of the Plaintiff's State Law Claims Necessarily Turns on the Construction of Federal Patent Law

The Supreme Court has set forth two possible types of federal question jurisdiction under 28 U.S.C. §1338(a). First, there is federal jurisdiction if federal law "creates the cause of action," and second, there is federal jurisdiction if "the plaintiff's rights to relief necessarily depend on resolution of a substantial question of federal law." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808 (1988). In the present case, the second basis for federal jurisdiction applies because the Plaintiff's state law claims (sounding in the misappropriation of inventions) can only be resolved by a determination of the scope of the "inventions" at issue – a question governed exclusively by federal patent law.

To evaluate whether the state law claims require the resolution of a substantial question of federal law, "the court must consider as a whole the substance of the claim in addition to the language of the complaint, and may also consider jurisdictional facts outside the pleadings." *Air Prods. and Chems., Inc. v. Reichhold Chem., Inc.*, 755 F.2d 1559, 1561 (Fed. Cir. 1985). Here, even a cursory review of the Complaint discloses that its allegations bear a significant relationship to patent issues. The Complaint contains no less than forty-two references to the word "patent." Similarly, the Complaint is riddled with references to other terms commonly associated with patent law, such as "patent application," "inventor," and "invention."[1] In short, the University's claims turn on issues that can only be resolved by resort to federal patent law, a subject exclusively within this Court's jurisdictional domain.

A more careful analysis of the allegations in the Complaint confirms this conclusion. The crux of the Plaintiff's claims is that the Defendants, Drs. Robl and Collas, misappropriated certain "University Inventions." To make out that misappropriation, the Plaintiff must establish parity between the Invention Disclosures UMA 99-19 (titled "Reprogramming Nuclear Function in Somatic Cell Cytoplasm") and UMA 01-02, (titled "Reprogramming of Somatic Cell Nuclei In Vitro for Use in Nuclear Transplantation") (the "Invention Disclosures"), on the one hand, and United States Patent Application No. 10/032,191 (titled "Methods for Cloning Mammals Using Reprogrammed Donor Chromatin") and United States Patent Application No. 10/015,824 (titled "Methods for Altering Cell Fate") (the "Patent Applications"), on the other.

---

[1] The meaning of each of these terms is specifically set forth in Title 35, United States Code. *See, e.g.*, 35 U.S.C. § 100 (defining the term "invention" as "invention or discovery"); 35 U.S.C. § 111 (setting forth the statutory requirements for an "application"); 35 U.S.C. § 116 (relating to "inventors"); *see also Burroughs Wellcome Co. v. Barr Laboratories, Inc.*, 40 F.3d 1223, 1227 (Fed. Cir. 1994) (describing that an inventor must contribute to the conception of an invention, which is the formation of a definite and permanent idea).

3

Based simply on quotations from news reports, the titles of the subject Patent Applications, the titles used in the Invention Disclosures, and the description of the inventions contained in the Invention Disclosures, the University argues that the University Inventions are identical to the claimed inventions disclosed in the pending Patent Applications filed by the Defendants at the PTO. However, any comparison between what is embodied in the Invention Disclosures with what is disclosed and claimed in the Patent Applications will require a detailed analysis of the scope, nature and purpose of the inventions described in the Patent Applications. In turn, this will require the application of principles of federal patent law.

First, this Court must determine what, if any, "invention" exists in either of the Invention Disclosures. Whether an invention exists turns on the issue of conception, which has been defined as the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention. In the field of biotechnology, wherein there is a high degree of unpredictability, conception requires more than just a spectral idea – it requires sufficient disclosure to enable one skilled in the art to practice the invention. *Cf. In re Fisher*, 427 F.2d 833 (C.C.P.A. 1970).

Once the Court determines the contours of any invention in the Invention Disclosures, it must then define the metes and bounds of the inventions claimed in the Patent Applications. *See Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 336 U.S. 271, 277 (1949) (holding that the scope of an invention is determined by the claims). The Supreme Court has held that the determination of the scope and meaning of a patent claim is a matter of federal law. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996). Only after completing this analysis, based on federal patent law, can the

Court contrast the scope of the inventions claimed by the Plaintiff in the Invention Disclosures with the Defendants' Patent Applications. *Cf. Apotex Inc. v. Thompson*, 347 F.3d 1335, 68 USPQ2d 1725, 1732 (Fed. Cir. 2003) (finding federal jurisdiction because the determination of whether patents are properly listed in the FDA Orange Book necessarily requires a determination of the scope of the patents).

The present case is clearly distinguishable from *AT&T*, the case chiefly relied on by the Plaintiff, because the Plaintiff's entire case is premised on the supposition that the University's Inventions are identical to those described in the pending Patent Applications. *See* Compl. ¶41 (alleging that "[t]he Cloning Mammals and Cell Fate applications disclose and describe the inventions of Invention Disclosures UMA 99-19 and UMA01-02"). This parity is elemental to the University's assertion that it owns the inventions described in the Patent Applications, per the terms of the University of Massachusetts Amherst Intellectual Property Policy ("Intellectual Property Policy") and the University of Massachusetts at Amherst Participation Agreements. In essence, the Plaintiff is asking this Court to determine whether one invention "covers" another, which is tantamount to an infringement analysis. *Cf. Nagle Industries, Inc. v. Ford Motor Co.*, 173 F.R.D. 448 (E.D. Mich. 1997) (finding state law misappropriation claim preempted by federal law because claim synonymous with patent infringement claim). The nexus between state law claims and issues of patent infringement is plainly revealed in the Complaint which states that the University will be irreparably harmed if it is unable to prevent Robl and Collas from "making, using, offering to sell or selling, or importing into the United States" the University Inventions. Compl. ¶47. The quoted language is derived from 35 U.S.C. §271, which is entitled "Infringement of Patent." Thus, unlike

the *AT&T* case, the relief requested by the Plaintiff does not merely require an interpretation of the underlying agreements, but also seeks precisely the remedy afforded against infringers by the patent statute.

Moreover, even if this Court determines that the Plaintiff's requested relief must be based on an interpretation of the terms used in the agreements, the terms here implicate federal patent law. Specifically, the term "invention" (which is referenced 110 times in Plaintiff's Complaint) is expressly defined in the Intellectual Property Policy as "[a] discovery or development that may be <u>protectable under the patent laws of the United States</u>...." Compl. Exhibit 1, Section I(I) (emphasis added). Moreover, the rationale for this Policy is to allow the University to obtain patent protection. *Id.* at Section III(C) (the Policy requests that "inventions" be disclosed promptly so that the University has "an opportunity to ... preserve or enhance [an invention's] value by <u>filing a patent application</u>") (emphasis added).

Although the University has framed the causes of action set forth in its Complaint as state-based claims, the Court must first decide a question of patent law prior to reaching any of the substantive allegations in the Complaint. *See Holiday Matinee, Inc. v. Rambus, Inc.*, 13 Cal. Rptr. 3d 766, 775 (Cal. App. 2004) (finding plaintiff's right to relief on state law claims necessarily depended on a question of patent law). In order for the Court to reach the state-law claims, the Court must first construe the claims and ascertain the scope and content of the claims in the Defendants' Patent Applications. After giving proper interpretation to the claim language and defining the scope of the inventions, the Court will have to decide as a matter of patent law whether the Defendants' Patent Applications are covered by the Invention Disclosures. *Cf. Abtox,*

6

*Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997) (holding that the test for patent coverage requires comparing the claims with the device). As a consequence, the claims presented in the Complaint arise under an act of Congress relating to patents within the meaning of the applicable jurisdictional statute, 28 U.S.C. § 1338(a).

II.  This Court has Diversity Jurisdiction Over this Action Because the Plaintiff is a Citizen for Purposes of this Litigation

District courts have diversity jurisdiction over all civil actions where the matter in controversy exceeds $75,000.00 and is between "citizens of different states." 28 U.S.C. § 1332(a)(1). Here, the Plaintiff does not contest that the amount in controversy does not exceed $75,000.00. Instead, the Plaintiff argues that "[b]ecause the University is a sovereign instrumentality, and not a citizen, it is not subject to diversity jurisdiction." Pl's. Mem. at 4.

Past rulings as to the University's sovereignty, however, do not control the diversity inquiry because the test for determining citizenship is not the same as the test for determining immunity. Moreover, the Plaintiff in this case is acting in a proprietary capacity through its Office of Commercial Ventures and Intellectual Property (the "CVIP"), and not in a traditional governmental role. For these and other reasons, the University should be deemed a citizen for purposes of this litigation, and the Motion for Remand should be denied.

A.  State Universities as Citizens for Purposes of Diversity Jurisdiction

State universities have been identified as citizens for diversity purposes. *See, e.g., Univ. of Rhode Island v. A. W. Chesterton Co.*, 2 F.3d 1200, 1202 (1st Cir. 1993) (finding the University of Rhode Island a citizen for diversity purposes); *Univ. Sys. of New*

*Hampshire v. United States Gypsum Co.*, 756 F. Supp. 640, 644 (D.N.H. 1991) (finding the University of New Hampshire a citizen for diversity purposes). As the relevant case law observes, each University functions differently, and "must be evaluated in light of its unique characteristics." *Chesterton*, 2 F.3d at 1204. To date, no case has determined whether or when the University of Massachusetts is a "citizen" for purposes of diversity jurisdiction.

In *University of Rhode Island v. A. W. Chesterton*,[2] however, the First Circuit established a general test for determining when a state university qualifies as a citizen for diversity purposes. *Id.* at 1205. In that case, the court propounded a non-exhaustive list of factors for courts to consider in deciding a university's citizenship status. These factors include whether the entity involved:

1. performs an "essential" or "traditional" governmental function, as opposed to a nonessential or merely proprietary one;
2. exercises substantial autonomy over its internal operations;
3. enjoys meaningful access to, and control over, funds not appropriated from the state treasury;
4. possesses the status of a separate "public corporation;"
5. may sue and be sued in its own name;
6. can enter into contracts in its own name;
7. has been granted a state tax exemption on its property; or
8. has been expressly debarred from incurring debts in the State's name or behalf.

*Id.* "These diverse considerations," according to the *Chesterton* court, "are designed to disclose the extent to which state law endows the incorporated State-related entity with

---

[2] In *Chesterton*, the plaintiff university brought suit against the defendant in Rhode Island state court alleging negligence, strict liability, and breach of warranty. *Chesterton*, 2 F.3d at 1201. The defendant, a Massachusetts corporation, promptly removed the action to federal court. *Id.* at 1202. The plaintiff then moved to remand, arguing that the university was an "alter ego, arm, or agent" of the State of Rhode Island and thus could not qualify as a "citizen" for purposes of diversity jurisdiction. *Id.* The District Court of Rhode Island denied the plaintiff's motion and the First Circuit affirmed on appeal. *Id.*

the operational authority, discretion, and proprietary resources with which to function independently of the State." *Id.*

Thus, *Chesterton* supplies the test for determining when and whether a university should be considered a citizen for purposes of diversity jurisdiction. The following sections will first distinguish *Chesterton* from immunity jurisprudence generally, and then apply the factors to this case in light of recent decisions recognizing that universities are only entitled to arm-of-the state protection in certain cases.

### B. A University's Ability to Invoke Sovereign Immunity Does Not Determine its Citizenship

Although the *Chesterton* analysis borrows from sovereign immunity and Eleventh Amendment case law, it does not replicate it. *Id.* at 1205.[3] The First Circuit has recognized that the test for determining when an entity is a citizen for purposes of diversity jurisdiction and the test for determining when an entity is entitled to invoke the state's immunity is not the same. *Neo-Gen Screening Inc. v. New England Newborn Screening Program*, 187 F.3d 24, 27 (1st Cir. 1999) (holding "[w]hether and when state universities are arms-of-the state for Eleventh Amendment purposes have long vexed the federal courts. The multi-part tests that we have used are not easy to apply, and, confusingly, overlap but *do not quite duplicate tests that determine whether a university is an independent entity for purposes of diversity jurisdiction.*") (emphasis added). Thus, the fact that the Plaintiff has been permitted to invoke the State's sovereign immunity in other circumstances does not automatically mean that it cannot be a citizen for purposes of diversity jurisdiction in this lawsuit. *See Chesterton*, 2 F.3d at 1204 n.7 (holding that

---

[3] Though the tests for diversity of citizenship and the tests for immunity are similar, the First Circuit has not had occasion to outline the differences. *Chesterton*, 2 F.3d at 1203 n.4. Regardless, immunity jurisprudence may be instructive in gauging an entity's independence from the state. *See id.*

9

past determinations under immunity jurisprudence are not determinative of the diversity question, especially where the entity involved is engaging in a new activity or its relationship to the state has changed); *Alabama State Univ. v. Baker & Taylor, Inc.*, 998 F. Supp. 1313, 1315 (D. Ala. 1998) (holding "the question of diversity jurisdiction is distinct from that of immunity").[4] The determination is case-specific, and each university must be evaluated in light of its particularities. *Univ. Sys. of New Hampshire*, 756 F. Supp. at 645 (holding "each state university exists in a unique governmental context, and each must be considered on the basis of its own particular circumstances") (internal citations omitted); *Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Auth.*, 991 F.2d 935, 939 (1st Cir. 1993) (holding the arm-of-the state inquiry "poses an essentially functional inquiry, not easily amenable to bright-line answers or mechanical solutions").

Thus, the fact that a university has been found to be an arm-of-the state in the immunity context is not determinative of the university's citizenship status in the diversity context. Whether a university should be allowed to invoke the state's sovereign

---

[4] To the extent that the test for determining Eleventh Amendment immunity is in fact the same as the test for determining the citizenship of a state university, the former has recently changed. In *Fresenius Medical Care Cardiovascular Resources v. Puerto Rico and the Caribbean Cardiovascular Center*, the First Circuit held in light of intervening Supreme Court precedent that the immunity test breaks down into two key questions. 322 F.3d at 68. First, "[h]as the state clearly structured the entity to share its sovereignty?" *Id.* Key factors in this assessment include: 1) the extent of state control including through the appointment of board members and the state's power to veto board actions or enlarge the entity's responsibilities; 2) how the enabling and implementing legislation characterized the entity and how the state courts have viewed the entity; 3) whether the entity's functions are readily classifiable as state functions or local or non-governmental functions; and 4) whether the state bears legal liability for the entity's debts. *Id.* Only if at least one of these factors points in a different direction from the others is the second part of the inquiry reached, namely the "risk that the damages will be paid from the public treasury." *Id.* Here, the question is whether the state would be obligated to pay a damage award issued against the entity in question. *Id.*

Even under *Fresenius*, the Plaintiff should still not escape a citizenship designation. Under the third factor articulated above, the University's function in bringing suit over the right to commercially exploit a patent cannot readily be classified as a state function. Rather, this is a commercial or non-governmental function. And because the State's coffers are in no danger of being subject to a damage award in this case, either because the defendant has not filed a counterclaim or because the revenues raised by the University vis-à-vis the CVIP, are more than adequate to bear any financial burden, the second factor weighs in the Defendants' favor. Thus, the University should be found to be a citizen under *Fresenius*, just as it should be found to be a citizen under *Chesterton* below.

protection must be made on a case-by-case basis. *See Neo-Gen*, 187 F.3d at 27 (asking whether the University of Massachusetts, in administering a prenatal screening program, should be granted immunity even after the University had already been granted immunity in other instances). To hold otherwise would be to allow a university to enjoy the state's protected status even when it is acting independent of the state.

### C. A University May be an Arm-of-the State for Some Purposes But Not Others

The Ninth Circuit, recognizing the circumstantial nature of the arm-of-the state inquiry, has explicitly held that a state university may qualify as an arm-of-the state for some purposes, but not for other purposes. *Doe v. Lawrence Livermore Nat'l Lab.*, 65 F.3d 771, 776 (9th Cir. 1995) (reversing the district court's decision that the University of California was *always* entitled to Eleventh Amendment immunity).[5] In *Doe*, the court found that the University of California "is an enormous entity which functions in various capacities and which is not entitled to Eleventh Amendment immunity for all of its functions." *Id.* at 775. Thus, the court ruled that *whether and when* the University of California was entitled to cloak itself in the State of California's immunity depended on the University's activity in the case at bar. *Id.*; *see also Neo-Gen*, 187 F.3d at 27 (considering "whether *and when*" state universities are arms-of-the state) (emphasis added); *Teichgraeber v. Mem'l Union Corp.*, 946 F. Supp. 900, 905 n.2 (D. Kan. 1996) (finding that "those entities operating in support of universities" must – like universities

---

[5] Although the Supreme Court later reversed the Ninth Circuit's immunity determination in *Doe*, the Court explicitly left open the question of whether a university may qualify as an arm-of-the state for some purposes, but not for other purposes. *Regents of the Univ. of California v. Doe*, 519 U.S. 425, 427 n.2 (1997) (finding it unnecessary "to decide whether there may be some state instrumentalities that qualify as 'arms of the State' for some purposes but not others"). Seemingly, the Court recognized the fact specific nature of the inquiry, and that a state university may deserve protection in some instances, but not others. Otherwise, they would have simply held that once an entity is deemed an arm-of-the state for one purpose, it will be found to be an arm-of-the state for all purposes.

11

themselves – be considered on a case-by-case basis for purposes of the arm-of-the state inquiry).

In light of the foregoing, two principles emerge. First, the diversity inquiry differs from the immunity inquiry. Thus, even if the University of Massachusetts has been granted sovereign immunity in other cases does not mean that it cannot be a citizen of the State in this case. *See Neo-Gen*, 187 F.3d at 27. Second, a university may qualify as an arm-of-the state in some instances but not others, based on the character of its conduct. *See Doe*, 65 F.3d at 775. Therefore, the arm-of-the state test should be applied on a case-by-case basis in light of how a university is acting in a particular case. *See, e.g., Daniel v. Amer. Bd. of Emergency Med.*, 988 F. Supp. 127, 178-81 (W.D.N.Y. 1996) (analyzing whether the University of Massachusetts Medical Center should be accorded immunity despite the fact that other decisions had granted the University immunity in different contexts).

D.  <u>In Light of its Conduct, the University Should be Deemed a Citizen for Purposes of this Litigation</u>

The University is undeserving of the State's protection in this case. Here, the University is commercializing intellectual property through the CVIP. *See About CVIP* at http://amherst.cvip-umass.net/ (last visited June 29, 2004) (stating that the CVIP was created in 1995 "to commercialize university research") (hereinafter "*CVIP-Amherst Website*") (attached hereto as Exhibit 1); Compl. ¶21 (stating the CVIP has "primary responsibility" for commercializing intellectual property through licensing and other

arrangements). The CVIP at Amherst,[6] was established in 1997 and "is responsible for evaluating, protecting and commercializing UMass research that may have commercial value through licensing to startup companies and appropriate commercial firms." *CVIP-Amherst Website*. The "economic payback" from these endeavors flows "to the inventors, the sponsors and the university." *Id.*[7] In short, the University, through the CVIP, is acting in a purely entrepreneurial capacity in which it shares the risks and rewards of its endeavors with its commercial partners. Under these circumstances, per the teaching of *Chesterton*, the University should not be allowed to avoid federal diversity jurisdiction.

The first *Chesterton* factor asks whether the plaintiff performs an essential or traditional government function, as opposed to a nonessential or merely proprietary function. 2 F.3d at 1205. Here the University, through the CVIP, is exploiting intellectual property through licensing and other arrangements with private enterprise. *See Intellectual Property Policy*, Compl. Exhibit 1, Section III(G). This is not a traditional governmental function, but rather it is a proprietary function (or at minimum a "nonessential function"). *See Teichgraeber*, 946 F. Supp. at 905 (finding that a student union operating at a state university was not an arm-of-the state as the record did not disclose that the union performed a traditional government function). As the First Circuit in *Fresenius Medical Care Cardiovascular Resources v. Puerto Rico and the Caribbean Cardiovascular Center* recognized:

---

[6] Notably, the CVIP at Amherst is a signatory to the intellectual property agreement signed by Collas and appended to the Plaintiff's Complaint. Though post-dating Robl's agreement, the CVIP would still be the entity charged with exploiting any intellectual property rights gained in this lawsuit.

[7] Additionally, the CVIP is charged with the tasks of proactively marketing University technology and negotiating the "best deal" in University licensing agreements. *CVIP-Amherst Website*, Exhibit 1.

13

> Not all entities created by states are meant to share state sovereignty. Some entities may be part of an effort at privatization, representing an assessment by the state that the private sector may perform a function better than the state. Some entities may be meant to be commercial enterprises, viable and competitive in the marketplace in which they operate. Such enterprises may need incentives to encourage others to contract with them, such as the incentives of application of usual legal standards between private contracting parties. The dollar cap on recovery found in many state sovereign immunity statutes would be a powerful disincentive to a private party to contract with an entity, unless the private party first obtained a waiver of immunity from the entity.

322 F.3d at 64. Given the commercial nature of the University's activity, the first *Chesterton* factor weighs decidedly in the Defendants' favor.

The second *Chesterton* factor asks whether the entity enjoys substantial control over internal operations. The power to generate non-appropriated revenues supports such a finding. *See id.* at 1206 n.9. In addition, the power to control property suggests autonomy. *Id.* at 1208. Finally, the First Circuit has also found that a university's ability to hire its own attorneys demonstrates its independence. *Id.* at 1207 n.11.

The CVIP is expected to generate $25,000,000.00 in licensing revenues this year. *See* John T. Hoey, *President Wilson awards grants to accelerate research commercialization* (May 5, 2004) at http://www.massachusetts.edu (last visited June 29, 2004) (attached hereto as Exhibit 2). It generated over $20,000,000.00 in revenues last year. *CVIP Annual Report* (attached hereto as Exhibit 3). Thus, the Plaintiff, in acting through the CVIP, is obviously capable of generating significant revenues, independent of any state funding.

Furthermore, the University may, by statute, manage and administer its own property. *See* Mass. Gen. Laws ch. 75 § 11. The CVIP, in turn, has authority to alienate the University's intellectual property. *See* Intellectual Property Policy, Compl. Exhibit 1, Section I.D. Such powers have been held to support a finding of independence from the

state in similar arm-of-the state jurisprudence. *See Chesterton*, 2 F.3d at 1208; *York v. Jones*, 717 F. Supp. 421, 428-29 (E.D. Va. 1989) (finding that a state university's medical college was not an arm-of-the state because the property at the center of the parties contract dispute was controlled by the college).

Finally, the University has hired a specialty patent law firm to represent its interests in this matter. The Attorney General's office is not representing the CVIP in this case. In light of these considerations, it is clear that the University enjoys substantial control over internal operations in this case. Accordingly, the second *Chesterton* factor falls in the Defendants' favor.

Third, *Chesterton* looks to whether an entity enjoys meaningful access to, and control over, funds not appropriated from the state treasury. 2 F.3d at 1205. Courts have consistently recognized that in determining whether an entity is worthy of protection as an alter ego of the state, financial autonomy is critical. *See Chesterton*, 2 F.3d at 1210 n.15; *University Sys. of N. H.*, 765 F. Supp. at 644 (holding that "[w]ith sufficient autonomy from the state, *especially with regard to financial matters*, a[]...state university is the real party in interest and is thus a 'citizen' for the purposes of diversity jurisdiction") (emphasis added). The availability of substantial revenue from other sources – including monies generated from university property – suggests financial autonomy. *See Chesterton*, 2 F.3d at 1210.

There can be no doubt that CVIP enjoys considerable control over the funds generated through its licensing activities. The Intellectual Property Policy discloses that the income generated from licensing University-owned intellectual property, minus expenses, flows to:

15

  (1) CVIP to fund research and operations (15%),

  (2) the inventor of the property (30%),

  (3) the University entity or entities who supported the development of the property to fund research and scholarship (15%), and

  (4) the campus of the inventor to fund research and scholarship (40%).

Compl. Exhibit 1, Sections III(G)(1)(a)-(b). It is, therefore, apparent that none of these monies go to the University as a whole or to the State's general treasury. Furthermore, the CVIP may accept equity in a private corporation in lieu of royalties. Compl. Exhibit 1, Section III.G.2. In light of these facts, and the fact that the CVIP anticipates collecting $25,000,000.00 in revenues this year alone, it is clear that the University enjoys unfettered access to and significant control over funds wholly outside of the legislative appropriation process. Accordingly, application of the third *Chesterton* element tilts in favor of the Defendants' requested removal.

  Fourth, *Chesterton* looks to whether a university possesses the status of a separate public corporation. It is not disputed that the University is a separate public corporation. *See* Mass. Gen. Laws ch. 75 § 1. In addition, in commercializing intellectual property, the CVIP enjoys separate status from the State at large, as part of the growing movement toward privatized commercial research endeavors sponsored by Massachusetts academic institutions.[8] Consistent with this development is the express recognition by the

---

[8] The University of Massachusetts Research Foundation, Inc., was created "for the purpose of promoting research at the university by obtaining, administering or disposing of patents or inventions resulting from such research or otherwise and devoting the income therefrom to further research, beneficial to the university and to the Commonwealth." Mass. Gen. Law ch. 75 § 14C. The Foundation is authorized to (1) receive and hold in separate custody real or personal property; (2) receive and hold in separate custody compensation or reimbursement resulting from inventions, patents, contractual or other research; (3) disburse funds so acquired for purposes of instruction, research, tests, invention, discovery, development or engineering; (4) obtain, administer and dispose of patents, assignments, grants, licenses or other rights and hold the same in separate custody; (5) make assignments, grants, licenses, or other disposal equitably in the public interest of any rights owned, acquired or controlled by the Foundation in or to inventions, discoveries, patent applications or patents, and to charge therefor and collect and to incorporate in funds in the custody of the Foundation reasonable compensation in such form as the board of trustees may

Massachusetts Legislature that certain divisions within the University, such as the CVIP, which are charged with administering intellectual property rights, will enjoy powers distinct from the University at large.[9] Therefore, the fourth *Chesterton* factor must weigh in the Defendants' favor.

The fifth *Chesterton* factor focuses on whether the entity in question may sue or be sued in its own name. Clearly, the Plaintiff may sue in it's own name, and has elected to do so in this case. In fact, the University of Massachusetts has litigated extensively in this District. Thus, this factor also favors removal.

Sixth, *Chesterton* examines whether an entity may enter into contracts in its own name. *Id.* at 1205. Here, the Plaintiff is bringing *breach of contract* claims against the Defendants. Compl. ¶¶ 55-63. Further, the Plaintiff appended an agreement to its Complaint wherein CVIP Amherst is a signatory. Accordingly, its clear the Plaintiff can enter into contracts, and that this factor weighs in the Defendants' favor.

Finally, the eighth *Chesterton* factor weighs in the Defendants' favor because there is no indication that the University has been expressly debarred from incurring debts on the State's behalf.

In applying the *Chesterton* factors to the case at bar, it becomes clear that the University is acting in a commercial capacity, and that it enjoys considerable autonomy

---

determine; and (6) execute contracts for the purpose of carrying out the provisions hereof and permitting such employees or others to share in the net proceeds of such contracts as the board of trustees shall determine. *Id.*

[9] In November of last year, the legislature established the Massachusetts Technology Transfer Center ("MTTC"). Mass. Gen. Law ch. 75 § 45 (2004). The MTTC is charged with the responsibility of "facilitat[ing] the transfer of technology from the commonwealth's research institutions to the commonwealth's industries, for productive use by such industries." *Id.* § 45(a). In addition, the MTTC is authorized to assist public and private research institutions in commercializing and licensing their technologies. *Id.* § 45(b).

in licensing intellectual property and collecting the resulting revenues. Accordingly, the University should be deemed a citizen for purposes of diversity jurisdiction.

## CONCLUSION

For the foregoing reasons, Defendants Robl and Collas respectfully request that this Court deny the Plaintiff's Motion to Remand.

JAMES M. ROBL AND PHILIPPE COLLAS,

By their attorneys,

*/s/ Tara C. Clancy*

Thomas F. Holt, Jr. (BBO# 238830)
Tara C. Clancy (BBO# 567020)
Amy B. Abbott (BBO# 648072)
75 State Street
Boston, MA 02109
(617) 261-3100

Dated: July 9, 2004

## CERTIFICATE OF SERVICE

I, Amy B. Abbott, hereby certify that on July 9, 2004, I served a copy of the foregoing Defendants James M. Robl and Philippe Collas' Opposition to Plaintiff's Motion to Remand by hand delivery upon Heidi E. Harvey, Esq., Fish & Richardson PC, 225 Franklin Street, Boston, MA 02110.

*/s/ Amy B. Abbott*
Amy B. Abbott